**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| TRINITY LAUGA, derivatively on behalf of BIGBEAR.AI HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> KEVIN MCALEENAN, LOUIS R. BROTHERS, AMANDA LONG, JOSHUA KINLEY, JULIE A. PEFFER, SEAN BATTLE, PAMELA BRADEN, PETER CANNITO, RALUCA DINU, PAUL FULCHINO, JEFFREY HART, DOROTHY D. HAYES, RANAAN I. HOROWITZ, AVI KATZ, and KIRK KONERT, <br><br> Defendants, <br><br> and <br><br> BIGBEAR.AI HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: 1:25-cv-1128 <br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Trinity Lauga ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant BigBear.ai Holdings, Inc. ("BigBear" or the "Company"), files this Verified Shareholder Derivative Complaint against Kevin McAleenan ("McAleenan"), Louis R. Brothers ("Brothers"), Amanda Long ("Long"), Joshua Kinley ("Kinley"), Julie A. Peffer ("Peffer"), Sean Battle ("Battle"), Pamela Braden ("Braden"), Peter Cannito ("Cannito"), Raluca Dinu ("Dinu"), Paul Fulchino ("Fulchino"), Jeffrey Hart ("Hart"), Dorothy D. Hayes ("Hayes"), Ranaan I. Horowitz ("Horowitz"), Avid Katz ("Katz"), and Kirk Konert ("Konert") (collectively, the "Individual Defendants" and together with BigBear, the "Defendants") for breaches of their

1

fiduciary duties as directors and/or officers of BigBear, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants McAleenan, Brothers, Long, Kinley, and Peffer for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BigBear, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by BigBear's current and/or former officers and directors from March 31, 2022 to March 25, 2025, both dates inclusive (the "Relevant Period").

2.      BigBear is a technology company which relies in large part on Artificial Intelligence ("AI"). More specifically, BigBear assists corporations and other organizations in operationalizing AI particularly with regard to the efficiency and accuracy of AI results. Moreover, much of BigBear's software assets are geared towards biometrics and digital identity. However, the Company has been expanding the use of these software assets to the world of personal finance. The Company provides such assistance in a variety of industries such as defense and national security. As such, several of the Company's main customers include U.S. defense and intelligence

agencies, and a substantial portion of the Company's revenue derives from contracts with public sector agencies.

3.    In June 2021, the Company entered into a merger agreement (the "Agreement") with BBAI Ultimate Holdings, GigCapital4, Inc., a special purpose acquisition company ("SPAC"), and GigCapital4 Merger Sub Corporation. Pursuant to the Agreement, BigBear first merged with GigCapital4 Merger Sub Corporation, with BigBear serving as the surviving entity. Immediately thereafter, BigBear merged with GigCapital 4, Inc., with GigCapital4 serving as the surviving entity. On December 7, 2021, the Agreement was consummated and GigCapital4 changed its name to BigBear.ai Holdings, Inc..

4.    After the completion of the Agreement, BigBear issued $200 million worth of unsecured convertible notes set to mature on December 15, 2026 (the "2026 Convertible Notes"). The 2026 Convertible Notes accrued interest at a 6% per annum rate, payable semi-annually. Excluding the settlement of any interest payments related to the 2026 Convertible Notes, the 2026 Convertible Notes were also able to be converted into a total of 17,391,304 shares of the Company's common stock at an initial Conversion Price of $11.50.

5.    The Relevant Period began on March 31, 2022, when the Company filed its Annual Report on Form 10-K with the SEC, for the period ended December 31, 2021 (the "2021 10-K"). In relevant part, the 2021 10-K stated that "[t]he [Company's] consolidated financial statements ***have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")***."[1] Throughout the Relevant Period, the Company would continue to represent that its accounting practices were adequate and on par with industry standards.

---

[1] Unless otherwise stated, all emphasis is added.

6.    Despite these positive representations concerning BigBear's accounting procedures, in reality the Company's practices were materially deficient. In particular, BigBear failed to properly account for the conversion option within the 2026 Convertible Notes and carried these errors forward in the financial statements it issued.

7.    The began to emerge on March 18, 2025, when the Company disclosed in a Form 8-K filed with the SEC that several of its financial statements made since 2021 should no longer be relied upon, and that such statements would be reissued. That same day, the Company reported in a separate Form 8-K filed with the SEC that the Company would be unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 "without unreasonable effort or expense."

8.    On this news, the Company's stock price fell $0.52 per share, or roughly 14.9%, from a closing price of $3.49 per share on March 17, 2025 to close at $2.97 per share on March 18, 2025.

9.    The truth finally emerged on March 25, 2025, in the after-market hours, when the Company filed its Annual Report on Form 10-K for the period ended December 31, 2024 with the SEC (the "2024 10-K"). The 2024 10-K discussed the Company's errors in prior financial statements, and provided an overview of the adjustments the Company made pursuant to the restatement of its previous financial statements. Notably, the 2024 10-K revealed that a "conversion option embedded within the 2026 Notes was incorrectly deemed to be eligible for a scope exception from the bifurcation requirements of ASC 815-15 and therefore requires bifurcation as a derivative ('2026 Notes Conversion Option')" and that subsequently "[t]he 2026 Notes include certain adjustments to the conversion rate that violate the 'fixed-for-fixed' criteria described in [ASC] 815-40." This required the Company's financial statements to be restated "to

4

reflect the issuance of the 2026 Notes Conversion Option at fair value as of December 7, 2021 and the subsequent remeasurement to fair value at each reporting date." The 2024 10-K also identified a material weakness in the Company's internal controls over financial reporting, namely that the Company had not "consistently executed [its] technical accounting review policies, inclusive of the application of certain interpretations subject to significant judgement or differences in interpretation, at a precision level sufficient to achieve complete, accurate and timely financial accounting, reporting and disclosures of certain non-routine, unusual, or complex transactions."

10. On this news, the Company's stock price fell $0.32 per share, or roughly 9.11%, from a closing price of $3.51 per share on March 25, 2025 to close at $3.19 per share on March 26, 2025.

11. Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the Company maintained inadequate accounting review policies concerning complicated or uncommon transactions; (2) as a result, BigBear incorrectly assessed that the stock conversion option within the 2026 Convertible Notes qualified for an exception under ASC 815-40; (3) the Company was in fact required to bifurcate the conversion option from the 2026 Convertible Notes for the purposes of accounting; (4) as a result of the foregoing, the Company incorrectly accounted for its 2026 Convertible Notes; (5) therefore, the Company incorrectly represented several items in its previous financial statements; (6) as a result of the foregoing, the Company would have to issue corrective financial statements; (7) the Company would require additional time and resources to make such corrective financial statements thereby substantially increasing the risk that the Company would fail to timely

file certain financial reports with the SEC; and (8) as a result of the foregoing, the Company was unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2024. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

12. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

13. The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

14. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price of the stock was artificially inflated, obtaining combined proceeds of *roughly $1.4 million.*

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), two of its former CEOs, its former Chief Financial Officer ("CFO"), and its former CFO and Chief Development Officer ("CDO") to a securities class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants McAleenan's, Brothers's, Long's, Kinley's, and Peffer's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14.a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.    Plaintiff is a current shareholder of BigBear. Plaintiff has continuously held BigBear common stock at all relevant times.

### Nominal Defendant BigBear

23.    BigBear is a Delaware corporation with principal executive offices at 7950 Jones Branch Drive, First Floor, North Tower, McLean, Virginia 22102. BigBear's common stock trades on The New York Stock Exchange ("NYSE") under the ticker symbol "BBAI."

### Defendant McAleenan

24.    Defendant McAleenan has served as the Company's CEO and as a Company director since January 15, 2025. Defendant McAleenan previously served as the Company's President.

25.    The Schedule 14A the Company filed with the SEC on April 29, 2025 (the "2025 Proxy Statement") stated the following about Defendant McAleenan:

**Kevin McAleenan** is the CEO of BigBear.ai, and serves on the company's Board of Directors. Before his promotion to CEO, Kevin served as President of BigBear.ai, where he led teams offering cutting-edge computer vision, simulation and modeling, and digital identity tools to support customers critical security and operational decisions. Kevin co-founded and led Pangiam as CEO and Chair of the Board until its acquisition by BigBear.ai, developing cutting edge biometric and AI products for security applications, for both government agencies and commercial customers.

Kevin brings experience from almost two decades of leadership in the U.S. Government to his role. He was the first career civil servant to be appointed and confirmed as Commissioner of U.S. Customs and Border Protection (CBP) in 2018, and he served most recently as Acting Secretary of the U.S. Department of Homeland Security (DHS) under President Donald Trump, where he led over 240,000 employees and oversaw operations at CBP, the Transportation Security Administration (TSA), the U.S. Coast Guard, the Cybersecurity and Infrastructure Security Agency (CISA), Secret Service, and others.

His past experiences include implementing innovations to the U.S. international arrival and departure process, developing comprehensive counter terrorism and risk management strategies, and overseeing the implementation of the U.S. government's single window for international trade, a project that spanned over 4-dozen agencies. Kevin received several awards for his service and leadership including a Presidential Rank Award—the nation's highest civil service award, a Service to America Medal, and multiple awards from travel and trade industry groups.

**Defendant Brothers**

26.     Defendant Brothers served as the Company's CEO and as a Company director from June 2020 to October 12, 2022.

27.     The Schedule 14A the Company filed with the SEC on May 12, 2022 (the "2022 Proxy Statement) stated the following about Defendant Brothers:

> **Dr. Louis R. Brothers.** Dr. Brothers serves as a member of our Board and has been our Chief Executive Officer since June 2020. Prior to that role, Dr. Brothers was the Chief Executive Officer at NuWave Solutions from June 2020 until its merger with PCI. Dr. Brothers has also served as the Chief Technology Officer of Peraton and a principal with The Chertoff Group. From 2014 to 2017, Dr. Brothers served as Under Secretary for Science and Technology at the U.S. Department of Homeland Security (DHS), where he was responsible for a science and technology portfolio that included basic and applied research, development, demonstration, testing, and evaluation with the purpose of helping DHS operational elements and the nation's first responders achieve their mission objectives. From 2011 to 2014, Dr. Brothers served as Deputy Assistant Secretary of Defense for Research at the Department of Defense. In this position, Dr. Brothers was responsible for policy and oversight of the Department's science and technology programs and laboratories. Dr. Brothers has also held senior roles at the Defense Advanced Research Projects Agency, BAE Systems, Draper Laboratory, and MIT Lincoln Laboratory. Dr. Brothers received a B.S. in Electrical Engineering from Tufts University, an M.S. in Electrical Engineering from Southern Methodist University, and a Ph.D. in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology. We believe that Dr. Brothers is qualified to serve on our Board based on his business experience, particularly working in executive positions for technology companies and various departments within the U.S. government providing services for the defense and homeland security industries.

**Defendant Long**

9

28.     Defendant Long served as the Company's CEO and as a Company director from October 12, 2022 to January 15, 2025.

29.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Long made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| December 9, 2024 | 200,000 | $4.25 | $850,000 |
| January 6, 2025 | 66,140 | $4.50 | $297,630 |

Thus, in total, before the fraud was exposed, she sold 266,140 shares of Company common stock on inside information, for which she received approximately $1.1 million in proceeds. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

30.     The Schedule 14A the Company filed with the SEC on April 26, 2024 (the "2024 Proxy Statement") stated the following about Defendant Long:

**Amanda Long.** Mrs. Long has served as our Chief Executive Officer and as a member of our Board since October 12, 2022. Mrs. Long previously served as Vice President of IT Automation at International Business Machines Corporation ("IBM") beginning in September 2021. Prior to that role, Mrs. Long held several positions with IBM, including Vice President of its Integration & Application Platform business from May 2021 to September 2021, General Manager of its Watson Health Provider Analytics business from September 2020 to May 2021, Chief Product & Strategy Officer of its Watson Health Imaging & Oncology/Genomics business from November 2019 to September 2020, Chief Product & Strategy Officer of its Watson Health Imaging business from April 2019 to November 2019, and Global Head of Artificial Intelligence Product & Strategy of its Watson Health Imaging business from October 2017 to March 2019. Mrs. Long also served as Vice President of Product Management at Modernizing Medicine Inc. from May 2014 to July 2017 and Vice President of Product Management & Strategy at Experian Health from December 2011 to April 2014.

Mrs. Long earned her Bachelor of Arts degree in Economics from Connecticut College. We believe that Mrs. Long is qualified to serve on our Board because of her extensive artificial intelligence and automation experience and her record of leadership.

**Defendant Kinley**

31. Defendant Kinley served as the Company's CDO from June 13, 2022 until being terminated from his position on December 30, 2022. Defendant Kinley previously served as the Company's CFO from December 2020 to June 13, 2022.

32. The 2022 Proxy Statement stated the following about Defendant Kinley:

**Joshua Kinley**. Mr. Kinley has served as the Chief Financial Officer of BigBear since December 2020. Prior to that, Mr. Kinley was the founder and Chief Financial Officer of PCI since its formation in April 2008. Before founding PCI, Mr. Kinley worked in multiple roles in the intelligence sector, including as a Senior Director at SI International and as a military intelligence officer in the U.S. Army. Mr. Kinley received a B.S. in Life Sciences from the United States Military Academy at West Point and an M.B.A. from John Hopkins University with a focus on IT Management.

**Defendant Peffer**

33. Defendant Peffer served as the Company's CFO from June 13, 2022 until June 6, 2025.

34. The 2025 Proxy Statement stated the following about Defendant Peffer:

**Julie Peffer.** Ms. Peffer has served as the Chief Financial Officer of BigBear since June 2022. Before joining the Company, Ms. Peffer served as Chief Financial Officer of MedeAnalytics from January 2021 to April 2022. Prior to that, Ms. Peffer served as Vice President, Finance at Amazon Web Services from February 2017 to March 2020. Ms. Peffer also served as Vice President, Finance at Flowserve Corporation from April 2014 to September 2016. Ms. Peffer has also held a variety of executive financial leadership positions encompassing P&L ownership as well as corporate and business level financial planning and analysis across multiple industries, including at Raytheon Space & Airborne Systems, ITT Geospatial Systems, Lennox International, and Textron. Ms. Peffer earned her Bachelor of Business Administration degree in Finance and Management from Texas Tech University and a Master of Business Administration degree from Baker University. Ms. Peffer was appointed as a director of Nine Energy Service, Inc., in March 2025, where she serves as a member of the Audit Committee.

**Defendant Battle**

35.    Defendant Battle has served as a Company director since December 2021, and currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

36.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Battle made the following sale of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| January 2, 2025 | 44,813 | $4.46 | $199,866 |

Thus, in total, before the fraud was exposed, he sold 44,813 shares of Company common stock on inside information, for which he received approximately $199,866 in proceeds. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

37.    The 2025 Proxy Statement stated the following about Defendant Battle:

Sean Battle. Mr. Battle has served as a member of our Board since December 2021 and served as our Chief Strategy Officer from December 2020 to December 2021. Mr. Battle has over 30 years of distinguished experience in the Intelligence Community (IC) and the Department of Defense. Mr. Battle began his career as a Signals Analyst in the U.S. Air Force. Before co-founding PCI Strategic Management, LLC (PCI), Mr. Battle served as a Civilian Executive with the National Security Agency, where he was responsible for the End User Computing Portfolio for the Agency. Mr. Battle was responsible for developing and executing a technology modernization plan for all Agency employees in this role. As the former Chief Strategy Officer of BigBear, Mr. Battle was responsible for leading integration, marketing and communications, facilitating mergers and acquisitions, strategic partnerships, and licensing opportunities consistent with enterprise strategy, goals, and objectives. Mr. Battle joined BigBear.ai in 2021 upon the merger of NuWave Solutions and PCI. Previously, Mr. Battle was Co-Founder and Chief Executive Officer of PCI. As the Chief Executive Officer of PCI, Mr. Battle leveraged his extensive management and leadership experience to develop and execute PCI's strategic plans, contract management, and business development. Under Mr. Battle's leadership, PCI won four Prime contracts, expanded to 14 states,

and has repeatedly been recognized as one of the best places to work both in the Mid-Atlantic and nationally. In a very competitive market, Mr. Battle's strategic planning and leadership were crucial in guiding PCI from its infancy as a small business to a major player in the full and open marketplace. Mr. Battle holds a J.D. from the University of Maryland, Baltimore, School of Law and a B.S. in Business Administration from Hawaii Pacific University. Mr. Battle has been a member of the Maryland Bar for 18 years and is active in the Armed Forces Communication Electronics Association (AFCEA) and the Fort Meade Alliance (FMA). We believe that Mr. Battle is qualified to serve on our Board because of his extensive technology and data analytics experience, particularly working with various defense and intelligence agencies within the U.S. government.

**Defendant Braden**

38.     Defendant Braden has served as a Company director since December 2021, and currently serves as a member of the Audit Committee.

39.     The 2025 Proxy Statement stated the following about Defendant Braden:

**Pamela Braden**. Ms. Braden has served as a member of our Board since December 2021. Ms. Braden is an Operating Partner at AE Industrial, bringing over 35 years of experience in the defense, technology and government services industries. Prior to joining AE Industrial in 2022, Ms. Braden was the Chief Executive Officer and Founder of Gryphon Technologies, an engineering services firm that became an AE Industrial portfolio company in 2018. Under Ms. Braden's leadership and AE Industrial's guidance, Gryphon grew to over $300 million with 1,500 engineers and technical personnel over a period of three years. The company pivoted from a privately owned engineering services firm into a leader in digital engineering, working with cyber assessment tools, migrating engineering data to the cloud, and performing predictive analytics on that data for national security organizations. Prior to Gryphon, Ms. Braden served as an executive at various government sector focused startups that ultimately grew into successful large businesses. We believe that Ms. Braden's decades of directorial experience in the defense field qualifies her to be a director on our Board.

**Defendant Cannito**

40.     Defendant Cannito has served as a Chairman of the Board since December 2021, and currently serves as a member of the Nominating and Corporate Governance Committee.

41.     The 2025 Proxy Statement stated the following about Defendant Cannito:

**Peter Cannito**. Mr. Cannito has served as a member of our Board since December 2021. Mr. Cannito has served as Chairman and Chief Executive Officer of Redwire, a space solutions company, since June 2020. Mr. Cannito also serves as an

13

Operating Partner at AE Industrial Partners (June 2019 to present). Prior to his current role, Mr. Cannito served as a consultant at NSNext, LLC from January 2019 until June 2019. Prior to that, Mr. Cannito served as the Chief Executive Officer of Polaris Alpha from June 2016 until December 2018, a high-tech solutions provider developing systems for the DoD and Intelligence Community. Prior to that, Mr. Cannito previously held executive roles, including Chief Executive Officer and Chief Operating Officer, at EOIR Technologies and he led a team of software and systems engineers at Booz Allen Hamilton focused on critical defense and intelligence programs. Mr. Cannito received a bachelor's degree in Finance from the University of Delaware, an M.B.A. from the University of Maryland, and served as an officer in the U.S. Marine Corps. We believe that Mr. Cannito's extensive experience in the defense, technology and government service industries qualifies him to serve as a director on our Board.

**Defendant Dinu**

42.    Defendant Dinu served as a Company director from December 2021 until March 27, 2024. During this time, Defendant Dinu served as a member of the Audit Committee. Defendant Dinu also co-founded GigCapital4, Inc. and served as its President, CEO, Secretary, and as a member of its Board until the consummation of the Agreement.

43.    The Schedule 14A the Company filed with the SEC on May 24, 2023 (the "2023 Proxy Statement") stated the following about Defendant Dinu:

**Dr. Raluca Dinu**. Dr. Dinu has served as a member of our Board since December 2021. Dr. Dinu co-founded GigCapital4 with Dr. Avi Katz, and served as a member of the board of directors, President, Chief Executive Officer and Secretary of GigCapital4 since its inception in December 2020. Upon the closing of the Business Combination, Dr. Dinu became a member of the board of directors and a member of the Audit Committee. Dr. Dinu has spent approximately 20 years in international executive positions within the technology, media and telecommunications ("TMT") industry working for privately held start-ups, middle-cap companies and large enterprises. In these roles, Dr. Dinu has been instrumental in launching and accelerating entities, building teams, large-scale fund raising, developing key alliances and technology partnerships, M&A activities, business development, financial management, global operations and sales and marketing. Dr. Dinu served as the President and Chief Executive Officer of GigCapital2, Inc. ("GIG2") from August 2019 until the closing of its business combination with UpHealth Holdings, Inc. and Cloudbreak Health, LLC in June 2021 and as a member of the board of directors, Chair of the Compliance Committee, and member of the Audit Committee and Compensation Committee of GIG2 (now UpHealth, Inc.) since March 2019. Dr. Dinu has served on the Board of Directors of GigCapital3, Inc. ("GIG3") (now Lightning eMotors, Inc.) from February 2020, until October 2021

14

and has served as the President, Chief Executive Officer and Secretary and on the Board of Directors of GigCapital5, Inc. ("GIG5") since February 2021. Dr. Dinu has held leadership positions at several other companies, including at IDT's Optical Interconnects Division (as Vice President and General Manager), GigPeak (as Executive Vice President, Chief Operation Officer, Executive Vice President of Global Sales and Marketing, and senior vice president of Global Sales and Marketing), Brazil-Photonics (as a Director) and Lumera Corporation (as Vice President of Engineering). Dr. Dinu holds a B.Sc. in Physics and Ph.D. in Solid State Condensed Matter Physics from the University of Bucharest, and an Executive-M.B.A. from Stanford University. Dr. Dinu has an Audit Committee Certificate and Compensation Committee Certificate from Harvard Business School, Executive Education Program. Dr. Dinu is married to Dr. Katz, one of our directors and GigCapital4, Inc. ("GIG4") Executive Chairman of the Board prior to the Business Combination. We believe that Dr. Dinu is qualified to serve on our Board based on her business experience as a board member of a publicly listed company and her investing experience.

**Paul Fulchino**

44.    Defendant Fulchino has served as a Company director since December 2021, and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

45.    The 2025 Proxy Statement stated the following about Defendant Fulchino:

**Paul Fulchino**. Mr. Fulchino has served as a member of our Board since December 2021. Mr. Fulchino has served as Operating Partner of AE Industrial Partners, LLC since June 2015. In addition, Mr. Fulchino was the Chairman of AEI HorizonX Ventures between 2019 and 2023, where he served on the Executive Committee and the M&A Committee. Mr. Fulchino provides the Board with executive leadership and experience, strategic thinking and extensive knowledge and expertise regarding the commercial aviation industry, the Company's customers and supply base, compensation and human resource matters, and mergers and acquisitions. Mr. Fulchino also brings valuable experience as a public company director, having served on the boards of multiple organizations, Spirit AeroSystems Holdings since 2006, Wesco Aircraft Holdings from 2008 to 2020, The Sports Authority, Inc. from 2000 to 2004, Medsource Technologies, Inc. from 2001 to 2005, and B/E Aerospace, Inc. from 1996 to 1999.

Prior to his current role, Mr. Fulchino served as a Senior Advisor to Boeing from April 2010 until December 2014. Prior to that, Mr. Fulchino held executive roles, including Chief Executive Officer, at Aviall, in which period Aviall became a wholly owned subsidiary of Boeing. Mr. Fulchino was also President and Chief Operating Officer of B/E Aerospace and President and Vice Chairman of Mercer

15

Management Consulting. Mr. Fulchino received a bachelor's degree in Mathematics from Boston College and an M.B.A. from Columbia Business School. Mr. Fulchino also attended the United States Military Academy at West Point. We believe that Mr. Fulchino's extensive experience in mergers and acquisitions and the commercial aviation industry, as well as his executive leadership experience qualifies him to serve as a director on our Board.

### Defendant Hart

46.     Defendant Hart has served as a Company director since December 2021, and currently serves as a member of the Compensation Committee.

47.     The 2025 Proxy Statement stated the following about Defendant Hart:

**Jeffrey Hart**. Mr. Hart has served as a member of our Board since December 2021. Mr. Hart joined AE Industrial Partners, LLC in 2015 as an Associate, and has served as a Principal since October 2020. Mr. Hart sat on the board of Redwire Space, Inc. before it was taken public via SPAC merger. Mr. Hart also sits on the board of Fire Team Solutions, Alpine Aviation and Edge Autonomy Holdings, Inc. ("*Edge Autonomy*") formerly known as UAV Factory, and REDLattice, all AE Industrial portfolio companies. Before joining AE Industrial, Mr. Hart was an investment banking analyst at RBC Capital Markets from 2013 to 2015. Mr. Hart earned his undergraduate degree from Colorado Mesa University. We believe that Mr. Hart's experience serving on the boards of multiple companies in the defense and technology sectors qualifies him to serve as a director on our Board.

### Defendant Horowitz

48.     Defendant Horowitz served as a Company director from December 2021 until May 16, 2023.

49.     The 2022 Proxy Statement stated the following about Defendant Horowitz:

**Raanan I. Horowitz**. Mr. Horowitz serves as a member of our Board. Mr. Horowitz has served on the board of directors of GigInternational1 as an independent director since March 2021, and has served on its Audit Committee since March 2021. He has also served on the board of directors GigCapital5, Inc. since September 2021 and has served on its Audit Committee since September 2021. Mr. Horowitz is the President, Chief Executive Officer, and a member of the board of directors of Elbit Systems of America, LLC, a leading provider of high-performance products and systems solutions for the defense, homeland security, commercial aviation, and life sciences diagnostics markets. Mr. Horowitz was appointed to such positions in 2007. Elbit Systems of America, LLC is a wholly owned subsidiary of Elbit Systems Ltd., a global source of innovative, technology-based systems for diverse defense and commercial applications with more than

19,500 employees in 15 countries. Prior to being appointed to lead Elbit Systems of America, LLC, Mr. Horowitz served as the Executive Vice President and General Manager of EFW, Inc., a subsidiary of Elbit Systems of America, from 2003 to 2007. In 2014, 2015, 2018 and 2022, The Ethisphere Institute named Elbit Systems of America one of the "World's Most Ethical Companies". In addition, Mr. Horowitz is active in the A&D industry, serving on the Board of Governors of the Aerospace Industries Association since 2008, the board of directors for the National Defense Industrial Association since 2015, as a member of Business Executives for National Security since 2014, and as a member of the Wall Street Journal Chief Executive Officer Council since 2018. Previously, Mr. Horowitz served on the National Board of Directors for one of the nation's largest volunteer health organizations, the Leukemia & Lymphoma Society, from 2009 to 2018. Mr. Horowitz earned a Master of Business Administration degree from the Seidman School of Business (1993) at Grand Valley State University in Allendale, Michigan. Mr. Horowitz was also awarded a Master of Science degree in Electrical Engineering (1991) and a Bachelor of Science degree in Mechanical Engineering (1981) from Tel-Aviv University in Israel. We believe that Mr. Horowitz is qualified to serve on our Board based on his business experience, particularly working in executive positions for technology companies providing services for the defense and homeland security industries.

**Defendant Hayes**

50.    Defendant Hayes has served as a Company director since December 2021, and currently serves as the Chair of the Audit Committee. Defendant Hayes previously served as a director on the Board of GigCapital4, Inc., until the consummation of the Agreement.

51.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hayes made the following sale of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| March 12, 2025 | 16,000 | $3.29 | $52,640 |

Thus, in total, before the fraud was exposed, she sold 16,000 shares of Company common stock on inside information, for which she received approximately $52,640 in proceeds. Her insider sale, made with knowledge of material non-public information before the material misstatements and

17

omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

52.    The 2025 Proxy Statement stated the following about Defendant Hayes:

**Dorothy D. Hayes**. Ms. Hayes has served as a member of our Board since December 2021. Ms. Hayes previously served on the board of directors and as Chair of both the Compensation Committee and Nominating and Corporate Governance Committee of GigCapital4, prior to its business combination with BigBear.ai in December 2021. Ms. Hayes also served on the board of directors and as Chair of the Audit Committee of GigCapital5 prior to its business combination with QT Imaging Holdings in March 2024. Ms. Hayes was appointed as a director of Intevac, Inc. in June 2019, where she served as the Chairwoman of the Audit Committee and a member of the Human Capital Committee until March 2025, when Intevac, Inc. was acquired by Seagate Technology Holdings plc. From 2003 until her retirement in 2008, Ms. Hayes served as Corporate Controller and Chief Accounting Officer and later as Chief Audit Executive at Intuit, a business and financial software company. From 1999 until 2003, Ms. Hayes served as Vice President, Corporate Controller and Chief Accounting Officer of Agilent Technologies, a public research, development and manufacturing company. From 1989 until 1999, Ms. Hayes served as Assistant Corporate Controller, financial executive of the Measurement Systems Organization and Chief Audit Executive of Hewlett Packard, a multinational information technology company. From 1980 until 1989, Ms. Hayes served in various management functions including Vice President, Corporate Controller of Apollo Computer, a computer hardware and software company. Ms. Hayes previously served on the Board of Directors at First Tech Federal Credit Union, a cooperative financial institution from 2011 until April 2024, including as Board Chair between 2016 until April 2022. Prior to its merger with First Tech Federal Credit Union, Ms. Hayes also served on the Board of Directors of Addison Avenue Federal Credit Union from 2002 until 2011. Ms. Hayes previously chaired the Audit Committee of the Vantagepoint Funds, a captive mutual fund series of ICMA Retirement Corporation, and the Audit Committee for Range Fuels, a privately held biofuels company. Ms. Hayes currently serves as a board member and chairs the finance committee of the non-profit CoGenerate (formerly Encore.org). Ms. Hayes holds an M.S. in Finance from Bentley University (1987), and received both an MS in Business Administration (1976) and a B.A. in Elementary Education (1972) from the University of Massachusetts, Amherst. Ms. Hayes maintains the NACD Board Leadership Fellow credential and has been a several-time attendee at Stanford Directors College. Ms. Hayes participates actively in Women Corporate Directors (WCD), the National Association of Corporate Directors (NACD), and the Athena Alliance. Ms. Hayes is a Senior Fellow of the American Leadership Forum—Silicon Valley, was a recipient of the YWCA TWIN award (1986) and was named to AGENDA Magazine's Diversity 100—Top Diverse Board Candidates (2010). We believe that Ms. Hayes is qualified to serve on our Board based on her business experience and her financial expertise.

**Defendant Katz**

53.     Defendant Katz served as a Company director from December 2021 until March 27, 2024. Defendant Katz co-founded GigCapital4, Inc., and served as its Chairman of the Board until the consummation of the Agreement.

54.     The 2023 Proxy Statement stated the following about Defendant Katz:

**Dr. Avi Katz**. Dr. Katz has served as a member of our Board since December 2021. Dr. Katz is the Founding Managing Partner of GigCapital Global, a serial issuer of Private-to-Public Equity ("*PPE*") entities, also known as Special Purpose Acquisition Companies ("*SPACs*"), which since the middle of 2017 has issued and completed initial public offerings for six PPE entities, and closed business combinations for four of the PPE entities with TMT companies, including GIG4, which he co-founded together with Dr. Raluca Dinu and served as its Executive Chairman of the board of directors prior to the closing of the Business Combination. Dr. Katz spent approximately 35 years in international managerial and executive positions within the TMT industry working for privately held start-ups, middle-cap companies and large enterprises. Dr. Katz has held leadership positions and served as Executive Chairman of the board of directors ("COB") of all the GigCapital Global issued PPE companies, including GigCapital1, Inc. ("*GIG1*"), which completed its initial public offering in December 2017 and later a business combination with Kaleyra in November of 2019 (NYSE: KLR), where he has since served as the COB of KLR; GIG2, which completed its initial public offering in June 2019 and later a business combination with UpHealth Holdings, Inc. and Cloudbreak Health, LLC in June 2021 (NYSE: UPH), which he has since served as the COB of UPH; GIG3, which completed its initial public offering in May 2020 and later a business combination with Lightning Systems in May 2021 (NYSE: ZEV); and GIG5, which completed its initial public offering in September 2021 and has announced in February 2023 a business combination agreement with QT-Imaging. Prior to the inception of GigCapital Global, Dr. Katz funded and bootstrapped GigOptix/GigPeak, Inc. (NYSE: GIG) from its inception in April 2007, and served as its COB, CEO and President of the company, during which period the company completed 10 M&A deals until its sale in April 2017 to IDT International. From 2003 to 2005, Dr. Katz was the CEO and President, and member of the board of directors of Intransa, Inc., and from 2000 to 2003, Dr. Katz was the CEO and President and a member of the board of directors of Equator Technologies. Dr. Katz has held several leadership positions over the span of his career within the technology industry since serving as Member of Technical Staff at AT&T Bell Laboratories at Murray Hill, New Jersey, between 1988 and 1994. Dr. Katz is a graduate of the 1976 class of the Israeli Naval Academy, graduate of the 1979 USA Navy ASW class, and holds a B.Sc. and Ph.D. in Semiconductors Materials from the Technion, Israel Institute of Technology. Dr. Katz is a serial entrepreneur, angel investor and holds many U.S. and international patents, has

published many technical papers and is the editor of a number of technical books. Dr. Katz has an Audit Committee certificate, Effective Corporate Board certificate and Advanced Corporate Directors certificate from Harvard Business School, Executive Education Program. Dr. Katz is a philanthropist and serves as a Member of the Advisory Council of the NY Philharmonic at the Lincoln Center in New York. Dr. Katz is married to Dr. Dinu, one of our directors and GIG4 CEO and member of the board prior to the Business Combination. We believe that Dr. Katz is qualified to serve on our Board based on his business experience as a founder, inventor, chief executive officer and director of a publicly listed company and his investing experience.

### Defendant Konert

55.     Defendant Konert has served as a Company director since December 2021, and currently serves as Chair of the Compensation Committee.

56.     The 2025 Proxy Statement stated the following about Defendant Konert:

**Kirk Konert**. Mr. Konert has served as a member of our Board since December 2021. Mr. Konert has served with AE Industrial Partners, LLC, as a Partner since October 2019 and as a Principal starting in August 2014. Mr. Konert sits on the boards of multiple AE Industrial portfolio companies, including AMPAC, Belcan, Columbia Helicopters, FireFly Aerospace, Pangiam Holdings, ThayerMahan, Redwire, and York Space Systems. Previously, Mr. Konert was a Senior Associate at Sun Capital Partners from July 2011 to July 2014. Mr. Konert earned his undergraduate degree from Davidson College. We believe that Mr. Konert's experience and history in portfolio company management qualifies him to be a director on our Board.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

57.     By reason of their positions as officers, directors, and/or fiduciaries of BigBear and because of their ability to control the business and corporate affairs of BigBear, the Individual Defendants owed BigBear and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BigBear in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BigBear and its shareholders so as to benefit all shareholders equally.

58.     Each director and officer of the Company owes to BigBear and its shareholders the

20

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

59.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of BigBear, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

60.    To discharge their duties, the officers and directors of BigBear were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

61.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BigBear, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of BigBear's Board at all relevant times.

62.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

21

growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

63.     To discharge their duties, the officers and directors of BigBear were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of BigBear were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to BigBear's own Code of Conduct & Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how BigBear conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of BigBear and procedures for the reporting of the business and

22

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BigBear's operations would comply with all applicable laws and BigBear's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64.    Each of the Individual Defendants further owed to BigBear and the shareholders the duty of loyalty requiring that each favor BigBear's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

65.    At all times relevant hereto, the Individual Defendants were the agents of each other and of BigBear and were at all times acting within the course and scope of such agency.

66.    Because of their advisory, executive, managerial, directorial, and controlling positions with BigBear, each of the Individual Defendants had access to adverse, non-public information about the Company.

23

67. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by BigBear.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

68. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

69. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

70. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of BigBear was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BigBear and was at all times acting within the course and scope of such agency.

## BIGBEAR'S CODE OF CONDUCT

73.    BigBear's Code of Conduct states that the Board has adopted the code "to deter wrongdoing and promote [*inter alia*] . . . honest and ethical conduct . . . full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files [with the SEC] . . . [and] the prompt internal reporting of violations of the Code[.]" The Code of Conduct further states that it applies to "[a]ll directors, officers, and employees [of the Company.]"

74.    In a section titled "Honest and Ethical Conduct," the Code of Conduct states the following:

> The Company's policy is to exhibit and promote high standards of integrity by conducting its affairs honestly and ethically, including acting in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.
>
> Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

75.    In a section titled "Disclosure," the Code of Conduct states the following:

25

The Company's periodic reports and other documents filed with the SEC and other regulators, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules, along with other public communications made by the Company.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

76.     In a section titled "Compliance," the Code of Conduct states the following:

Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates.

Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Legal Department.

Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

77.     In a section titled "Conflicts of Interest," the Code of Conduct states the following,

*inter alia*:

A conflict of interest occurs when an individual's private interest interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Company.

\* \* \*

Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized as described in the paragraph below.

\* \* \*

Directors and executive officers must seek determinations and prior authorizations or approvals of potential conflicts of interest exclusively from the Chief Financial Officer or Chief Executive Officer.

78.    In a section titled "Corporate Opportunities," the Code of Conduct states the following:

All directors, officers and employees owe a duty to the Company to advance its interests when the opportunity to do so arises. Directors, officers and employees are prohibited from taking for themselves personally opportunities that are discovered through the use of Company property, information or position. Directors, officers and employees may not use Company property, information or position for personal gain. In addition, no director, officer or employee may compete with the Company. This section is subject to any exemptions in the Company's current Certificate of Incorporation.

79.    In a section titled "Reporting and Investigation of Violations," the Code of Conduct states the following:

Allegations of actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee and the Chief Financial Officer or Chief Executive Officer.

Allegations of actions prohibited by this Code involving anyone other than a director or executive officer must be reported to the reporting person's supervisor or the Chief Financial Officer or Chief Executive Officer.

After receiving a report of an alleged prohibited action, the Audit Committee, the Chief Financial Officer or the Chief Executive Officer or the relevant supervisor must promptly take all appropriate actions necessary to investigate.

All directors, officers and employees are expected to cooperate in any internal investigation of misconduct.

27

80.    In a section titled "Waivers," the Code of Conduct states the following:

The Board or the Audit Committee (in the case of a violation by a director or executive officer) or the Chief Financial Officer or Chief Executive Officer (in the case of a violation by any other person) may, in its discretion, waive any violation of this Code.

Any waiver for a director or an executive officer shall be disclosed as required by SEC and New York Stock Exchange rules.

81.    In violation of the Code of Conduct, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## BIGBEAR'S AUDIT COMMITTEE CHARTER

82.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is to aid "the Board with oversight of . . . the integrity of the Company's financial statements . . . compliance with legal and regulatory requirements . . . the Company's independent auditor's qualifications and independence . . . [and] the performance of the Company's independent auditor and internal audit function."

83.    Regarding the Audit Committee's duties with respect to oversight of the independent auditor, the Audit Committee Charter states the following:

1. Auditor Appointment: To (1) appoint, retain or replace an independent registered public accounting firm to act as the Company's independent auditor for the purpose of auditing the Company's annual financial statements, books, records, accounts

28

and internal controls over financial reporting or performing other audit, review or attest services for the Company, (2) assess the qualifications, performance and independence of the Company's independent auditor, (3) set the compensation of the Company's independent auditor, (4) approve all audit engagement fees and terms, (5) oversee the work done by the Company's independent auditor, and (6) terminate the engagement of the Company's independent auditor, if necessary. The independent auditor shall report directly to the Audit Committee.

84.    With respect to the Audit Committee's oversight responsibilities, the Audit Committee Charter states the following, in relevant part:

8. Risk Assessment and Risk Management: Taking into consideration the allocation of responsibility for risk oversight to the other committees of the Board, to review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

85.    Regarding the Audit Committee's duties with respect to audited financial statements, the Audit Committee Charter states the following:

9. Annual Financials: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," to be included in the Company's annual report on Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board, based on the Audit Committee's review and discussion with management and the independent auditor, whether the audited financial statements should be included in the Company's annual report on Form 10-K.

10. Quarterly Financials: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly report on Form 10-Q before the Form 10-Q is filed.

11. Earnings Releases: To review and discuss with management and the Company's independent auditor: the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such

29

discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

12. Financial Statements Issues: To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles and compliance with legal and regulatory requirements, (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements, (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements, (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles, (5) the completeness and clarity of the disclosures in the financial statements, and (6) each identified critical audit matter, the independent auditor's basis for identifying a matter as a critical audit matter and how such identified matter will be described in the independent auditor's report.

86.    Regarding the Audit Committee's duties surrounding the quality of the Company's

accounting principles, the Audit Committee Charter states the following:

15. Auditor Communications: To review and discuss with the Company's independent auditor (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the independent auditor, (3) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences, and (4) as applicable, assurance that Section 10A(b) of the Exchange Act has not been implicated.

87.    The Audit Committee Charter states the following regarding the Audit Committee's

responsibilities surrounding compliance:

21. Code of Conduct and Ethics: To monitor compliance with the Company's Code of Conduct and Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code.

22. Legal Compliance: To review, with the General Counsel and or the Chief Administrative Office and outside legal counsel, legal and regulatory matters, relating to the Company and its subsidiaries that could have a significant impact on the Company's

financial statements; and to review the Company's compliance with applicable laws and regulations, review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.

88.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

89.    BigBear functions as a software technology company focused primarily on AI and AI optimization. Although the Company's software assets have typically been designed with a focus on digital identity and biometrics, BigBear has attempted to expand the use of its products to the market of personal finance. However, the Company's main customer base continues to be the defense and national security industries, particularly U.S. defense and intelligence agencies.

90.    Pursuant to the Agreement, BigBear first merged with GigCapital4 Merger Sub Corporation and then merged with GigCapital 4, Inc. The Agreement was consummated on December 7, 2021. Although GigCapital 4, Inc. remained the surviving entity following the second merger, pursuant to the consummation of the Agreement it changed its name to BigBear.ai Holdings, Inc.

91.    As a result of the Agreement, the Company issued the 2026 Convertible Notes,

31

worth $200 million in total and due to mature on December 15, 2026. The 2026 Convertible Notes accrued interest at a 6% per annum rate, payable semi-annually. At the maturation date, holders of the 2026 Convertible Notes could either recoup their principal with interest, or convert the notes equity. At the maturation date, the 2026 Convertible Notes could be converted into a total of 17,391,304 shares of the Company's common stock at a conversion price of $11.50 per share.

92.    The Company utilizes the Financial Accounting Standards Board's Accounting Standards Codification ("ASC") to account "for all transactions and events in which it obtains control over one or more other businesses (even if less than 100% ownership is acquired), to recognize the fair value of all assets and liabilities assumed and to establish the acquisition date fair value as of the measurement date."

93.    The Agreement and associated mergers constituted transactions requiring accounting under the ASC and thus required the Company to account for it, namely the Company's issuance of the 2026 Convertible Notes.

94.    As per ASC 815-15, a corporation or entity must separate embedded components from a host contract if: (1) "[t]he economic characteristics and risks of the embedded derivative are not clearly and closely related to the economic characteristics and risks of the host contract;" (2) "[t]he hybrid instrument is not remeasured at fair value under otherwise applicable generally accepted accounting principles (GAAP) with changes in fair value reported in earnings as they occur;" and (3) "A separate instrument with the same terms as the embedded derivative would, pursuant to Section 815-10-15, be a derivative instrument subject to the requirements of this Subtopic. (The initial net investment for the hybrid instrument shall not be considered to be the initial net investment for the embedded derivative.)." One example of an embedded component within a host contract is the conversion option within the Company's 2026 Convertible Notes.

95.     Additionally, a corporation or entity may avoid having to separate embedded components within a host contract if the component (also known as a derivative) qualifies under a "derivative scope exemption." One method of qualifying for an embedded derivative exception is through ASC 815-40, which applies to an entity's contracts indexed to its own stock.[2] As such, the requirement of BigBear to account for the conversion option within the 2026 Convertible Notes separately from the Agreement was contingent on whether the conversion option qualified under a derivative scope exception.

## FALSE AND MISLEADING STATEMENTS

### *March 31, 2022 Form 10-K*

96.     The Relevant Period began on March 31, 2022, when the Company filed the 2021 10-K with the SEC. The 2021 10-K was signed by Defendants Brothers, Kinley, Cannito, Battle, Braden, Dinu, Fulchino, Hart, Hayes, Horowitz, Katz, and Konert and attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Brothers and Kinley. The SOX certifications attested to the accuracy of the 2021 10-K and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

97.     Regarding the Company's significant accounting policies, the 2021 10-K stated, in relevant part, that "[t]he consolidated financial statements *have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP")*."

---

[2] Under ASC 815-40, an entity's instrument is considered indexed to its own stock if the instrument's settlement amount will equal the difference between the fair value of a fixed number of the entity's equity shares and a fixed monetary amount or a fixed amount of a debt instrument issued by the entity (the "fixed-for-fixed" rule).

98.    Further, the 2021 10-K stated the following with regard to the Company's disclosure controls and procedures, in relevant part:

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Annual Report on Form 10-K, and have concluded that, *based on such evaluation, our disclosure controls and procedures were effective as of December 31, 2021 at the reasonable assurance level to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms*, and is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

99.    Additionally, the Company reported in its consolidated balance sheet a "[t]otal stockholders' equity (deficit)" figure of $122,368,000 as of December 31, 2021.

**May 12, 2022 Form 10-Q**

100.    On May 12, 2022, the Company filed its Quarterly Report on Form 10-Q with the SEC, to report its financial and operational results for the quarter ended March 31, 2022 (the "1Q 2022 10-Q"). The 1Q 2022 10-Q was signed by Defendants Brothers and Kinley and attached SOX certifications signed by Defendants Brothers and Kinley. The SOX certifications attested to the accuracy of the 1Q 2022 10-Q and that "[t]he information contained in the [1Q 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

101.    Regarding the Company's adherence to Generally Accepted Accounting Principles ("GAAP"), the 1Q 2022 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

102.    Regarding the effectiveness of the Company's disclosure controls and procedures the 1Q 2022 10-Q represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

34

***August 12, 2022 Form 10-Q***

103.   On August 12, 2022, the Company filed its Quarterly Report on Form 10-Q with the SEC, to report its financial and operational results for the quarter ended June 30, 2022 (the "2Q 2022 10-Q"). The 2Q 2022 10-Q was signed by Defendants Brothers and Peffer and attached SOX certifications signed by Defendants Brothers and Peffer. The SOX certifications attested to the accuracy of the 2Q 2022 10-Q and that "[t]he information contained in the [2Q 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

104.   Regarding the Company's adherence to GAAP, the 2Q 2022 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

105.   Regarding the effectiveness of the Company's disclosure controls and procedures the 2Q 2022 10-Q represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

***November 10, 2022 Form 10-Q***

106.   On November 10, 2022, the Company filed its Quarterly Report on Form 10-Q with the SEC, to report its financial and operational results for the quarter ended September 30, 2022 (the "3Q 2022 10-Q"). The 3Q 2022 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 3Q 2022 10-Q and that "[t]he information contained in the [3Q 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

107.   Regarding the Company's adherence to GAAP, the 3Q 2022 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

108.    Regarding the effectiveness of the Company's disclosure controls and procedures the 3Q 2022 10-Q represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

### March 31, 2023 Form 10-K

109.    On March 31, 2023, the Company filed its Annual Report on Form 10-K with the SEC, for the period ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Long, Peffer, Cannito, Battle, Braden, Dinu, Fulchino, Hart, Hayes, Horowitz, Katz, and Konert and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 2022 10-K and that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

110.    Regarding the Company's adherence to GAAP, the 2022 10-K represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

111.    Additionally, the 2022 10-K disclosed an amortization of debt issuance costs figure of $2,302,000, a "[d]eferred income tax (benefit) expense" figure of $1,757,000, and a "[n]et increase (decrease) in fair value of derivatives" figure of $1,591,000 on its consolidated statement of cash flows for the year ended December 31, 2022.

### May 15, 2023 Form 10-Q

112.    On May 15, 2023, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the quarter ended March 31, 2023 (the "1Q 2023 10-Q"). The 1Q 2023 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the

accuracy of the 1Q 2023 10-Q and that "[t]he information contained in the [1Q 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

113.    Regarding the Company's adherence to GAAP, the 1Q 2023 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

114.    Further, the 1Q 2023 10-Q reported a derivative liabilities figure of $25,469,000 on its consolidated balance sheet as of March 31, 2023. Moreover, the 1Q 2023 10-Q reported that for the three months ended March 31, 2023, the Company recorded an interest expense figure of $3,556,000, a "[n]et increase (decrease) in fair value of derivatives" figure of $10,567,000, and a net loss of $26,214,000 on its consolidated statement of operations, and an amortization of debt issuance costs figure of $500,000 on its consolidated statement of cash flows.

### *May 24, 2023 Proxy Statement*

115.    On May 24, 2023, the Company filed the 2023 Proxy Statement with the SEC. The 2023 Proxy Statement was solicited by Defendants Long, Battle, Braden, Cannito, Dinu, Fulchino, Hart, Hayes, Katz, and Konert pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

116.    The 2023 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Long, Braden, Dinu, and Katz to serve as Class II directors for three-year terms; and (2) ratify the appointment of Grant Thornton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2023.

117.    With respect to the Code of Conduct and Ethics, the 2023 Proxy Statement stated:

> We have adopted a Code of Conduct and Ethics that applies to our directors, officers and employees in accordance with applicable federal securities laws, a copy of which is available under the Governance heading, Governance Documents subheading, on the Investor Relations page of our website at https://ir.bigbear.ai/. We will make a printed copy of the Code of Conduct and Ethics available to any stockholder who so requests.

If we amend or grant a waiver of one or more of the provisions of our Code of Conduct and Ethics, we intend to satisfy the requirements under Item 5.05 of Item 8-K regarding the disclosure of amendments to or waivers from provisions of our Code of Conduct and Ethics that apply to our principal executive officer, principal financial officer and principal accounting officer by posting the required information on our website at https://bigbear.ai/. The information on this website is not part of this Proxy Statement on Form DEF14A.

118.    In a section titled "Risk Oversight," the 2023 Proxy Statement stated the following:

Our Board oversees an enterprise-wide approach to risk management, designed to support the achievement of organizational objectives, to improve long-term organizational performance, and to enhance stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to manage those risks but also understanding what level of risk is appropriate for a given company. The involvement of our full Board in reviewing our business is an integral aspect of its assessment of the Company's risk profile and also its determination of what constitutes an appropriate level of risk.

While our full Board has overall responsibility for risk oversight, it has delegated primary oversight of certain risks to its committees. Our Audit Committee monitors our major financial risk exposures and cybersecurity risks, and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee is committed to the prevention, timely detection, and mitigation of the effects of cybersecurity threats or incidents to the Company. Our Audit Committee also monitors compliance with legal and regulatory requirements, strategies and progress of audits and remediation efforts. Our Compensation Committee oversees the design and implementation of our compensation and benefits programs and policies and monitors the incentives created by these programs and policies to determine whether they encourage excessive risk-taking. Our Compensation Committee also assesses the relationship between risk management policies and practices and compensation, and evaluates compensation policies and practices that could mitigate any such risk. Our Nominating and Corporate Governance Committee oversees our major corporate governance risks.

In connection with its reviews of the operations of our business, our full Board addresses the primary risks associated with our business, such as regulatory and legal risks, financial and liquidity risks, and strategic planning. Our Board appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

We are committed to ensuring our Board and its committees are consistently updated on threats to our business and receive consistent updates on risk mitigation processes. At periodic meetings of our Board and its committees, management reports to and seeks guidance from our Board and its committees with respect to what we believe are the most significant risks that could affect our business, such as strategic legal, regulatory, privacy, financial, tax and audit related risks.

119.    Defendants Long, Battle, Braden, Cannito, Dinu, Fulchino, Hart, Hayes, Katz, and Konert caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company maintained inadequate accounting review policies concerning complicated or uncommon transactions; (2) as a result, BigBear incorrectly assessed that the stock conversion option within the 2026 Convertible Notes qualified for an exception under ASC 815-40; (3) the Company was in fact required to bifurcate the conversion option from the 2026 Convertible Notes for the purposes of accounting; (4) as a result of the foregoing, the Company incorrectly accounted for its 2026 Convertible Notes; (5) therefore, the Company incorrectly represented several items in its previous financial statements; (6) as a result of the foregoing, the Company would have to issue corrective financial statements; (7) the Company would require additional time and resources to make such corrective financial statements thereby substantially increasing the risk that the Company would fail to timely file certain financial reports with the SEC; and (8) as a result of the foregoing, the Company was unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2024. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

120.    The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the

Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

121.   As a result Defendants Long, Battle, Braden, Cannito, Dinu, Fulchino, Hart, Hayes, Katz, and Konert causing the 2023 Proxy Statement to be false and misleading, Company shareholders: (1) reelected Defendants Long, Braden, Dinu, and Katz to the Board, thereby allowing them to continue to breach their fiduciary duties to BigBear; and (2) ratified the appointment of Grant Thornton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2023.

***August 10, 2023 Form 10-Q***

122.   On August 10, 2023, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the quarter ended June 30, 2023 (the "2Q 2023 10-Q"). The 2Q 2023 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 2Q 2023 10-Q and that "[t]he information contained in the [2Q 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

123.   Regarding the Company's adherence to GAAP, the 2Q 2023 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

124.   Further, the 2Q 2023 10-Q recorded a derivative liabilities figure of $44,126,000 on its consolidated balance sheet as of June 30, 2023. The 2Q 2023 10-Q, in its consolidated statement of operations, reported an interest expense figure of $3,560,000 for the second quarter of 2023 and $7,116,000 for the six months ended June 30, 2023 and a net loss of $16,895,000 for the second quarter of 2023 and $43,109,000 for the six months ended June 30, 2023. Moreover,

the 2Q 2023 10-Q represented on its consolidated statement of cash flows that the Company reported an amortization of debt issuance costs figure of $1,006,000 and a "[n]et increase (decrease) in fair value of derivatives" figure of $13,688,000 for the six months ended June 30, 2023.

### November 9, 2023 Form 10-Q

125.    On November 9, 2023, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the quarter ended September 30, 2024 (the "3Q 2023 10-Q"). The 3Q 2023 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 3Q 2023 10-Q and that "[t]he information contained in the [3Q 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

126.    Regarding the Company's adherence to GAAP, the 3Q 2023 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

127.    The 3Q 2023 10-Q also disclosed that the Company recorded a derivative liabilities figure of $28,476,000 on its consolidated balance sheet as of September 30, 2023. The 3Q 2023 10-Q further disclosed, in its consolidated statement of operations, that the Company recorded an interest expense figure of $3,540,000 for the third quarter of 2023 and $10,656,000 for the nine months ended September 30, 2023, and a net loss of $39,110,000 for the nine months ended September 30, 2023. Moreover, the 3Q 2023 10-Q reported in its consolidated statement of cash flows that the Company recorded an amortization of debt issuance costs figure of $1,512,000 for the nine months ended September 30, 2023.

### March 7, 2024 Press Release

128.    On March 7, 2024, the Company issued a press release concerning BigBear's financial results for the fourth quarter of 2023 (the "4Q 2023 Press Release"). The 4Q 2023 Press Release stated that the Company recorded an interest expense figure of $3,544,000 and a net loss of $21,256,000 for the three months ended December 31, 2023.

### March 15, 2024 Form 10-K

129.    On March 15, 2024, the Company filed its Annual Report on Form 10-K with the SEC, for the period ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Long, Peffer, Cannito, Battle, Braden, Dinu, Fulchino, Hart, Hayes, Katz, and Konert and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 2023 10-K and that "[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

130.    Regarding the Company's adherence to GAAP, the 2023 10-K represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

131.    Regarding the effectiveness of the Company's disclosure controls and procedures the 2023 10-K represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

132.    The 2023 10-K also represented that the Company recorded a derivative liabilities figure of $37,862,000 on its consolidated balance sheet as of December 31, 2023. The 2023 10-K also represented that in the period ended December 31, 2023, the Company recorded an interest expense figure of $14,200,000 and a net loss of $60,366,000 on its consolidated statement of operations. Moreover, the 2023 10-K represented that the Company recorded an amortization of debt issuance costs figure of $2,018,000, and a "[d]eferred income tax (benefit) expense" figure of $88,000 on its consolidated statement of cash flows.

42

*April 26, 2024 Proxy Statement*

133. On April 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. The 2024 Proxy Statement was solicited by Defendants Long, Battle, Braden, Cannito, Fulchino, Hart, Hayes, and Konert pursuant to Section 14(a) of the Exchange Act, and contained materially false and misleading statements.

134. The 2024 Proxy Statement solicited shareholders to vote to, inter alia: (1) re-elect Defendants Cannito, Hart, and Konert to serve as Class III directors for three-year terms; and (2) ratify the appointment of Grant Thornton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2024.

135. With respect to the Code of Conduct and Ethics, the 2024 Proxy Statement stated:

We have adopted a Code of Conduct and Ethics that applies to our directors, officers and employees in accordance with applicable federal securities laws, a copy of which is available under the Governance heading, Governance Documents subheading, on the Investor Relations page of our website at https://ir.bigbear.ai/. We will make a printed copy of the Code of Conduct and Ethics available to any stockholder who so requests.

If we amend or grant a waiver of one or more of the provisions of our Code of Conduct and Ethics, we intend to satisfy the requirements under Item 5.05 of Item 8-K regarding the disclosure of amendments to or waivers from provisions of our Code of Conduct and Ethics that apply to our principal executive officer, principal financial officer and principal accounting officer by posting the required information on our website at https://bigbear.ai/. The information on this website is not part of this Proxy Statement.

136. In a section titled "Risk Oversight," the 2024 Proxy Statement stated the following:

Our Board oversees an enterprise-wide approach to risk management, designed to support the achievement of organizational objectives, to improve long-term organizational performance, and to enhance stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to manage those risks but also understanding what level of risk is appropriate for a given company. The involvement of our full Board in reviewing our business is an integral aspect of its assessment of the Company's risk profile and also its determination of what constitutes an appropriate level of risk.

While our full Board has overall responsibility for risk oversight, it has delegated primary oversight of certain risks to its committees. Our Audit Committee monitors our major financial risk exposures, and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Board of Directors, as well as the Audit Committee and Nominating and Governance Committee have oversight of risks from cybersecurity threats. Each of these bodies is informed of these risks at quarterly meetings at a minimum, and on an ad hoc basis, as necessary. Our Audit Committee also monitors compliance with legal and regulatory requirements, strategies and progress of audits and remediation efforts. Our Compensation Committee oversees the design and implementation of our compensation and benefits programs and policies and monitors the incentives created by these programs and policies to determine whether they encourage excessive risk-taking. Our Compensation Committee also assesses the relationship between risk management policies and practices and compensation, and evaluates compensation policies and practices that could mitigate any such risk. Our Nominating and Corporate Governance Committee oversees our major corporate governance risks.

In connection with its reviews of the operations of our business, our full Board addresses the primary risks associated with our business, such as regulatory and legal risks, financial and liquidity risks, and strategic planning. Our Board appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

We are committed to ensuring our Board and its committees are consistently updated on threats to our business and receive consistent updates on risk mitigation processes. At periodic meetings of our Board and its committees, management reports to and seeks guidance from our Board and its committees with respect to what we believe are the most significant risks that could affect our business, such as strategic legal, regulatory, privacy, financial, tax and audit related risks.

137. Defendants Long, Battle, Braden, Cannito, Fulchino, Hart, Hayes, and Konert caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company maintained inadequate accounting review policies concerning complicated or uncommon transactions; (2) as a result, BigBear incorrectly assessed that the stock conversion option within the 2026 Convertible Notes qualified for an exception under ASC 815-40; (3) the Company was in fact required to bifurcate the conversion option from the 2026 Convertible Notes for the purposes of accounting; (4) as a result of the foregoing, the Company incorrectly accounted for its 2026 Convertible Notes; (5) therefore, the Company incorrectly represented several items

44

in its previous financial statements; (6) as a result of the foregoing, the Company would have to issue corrective financial statements; (7) the Company would require additional time and resources to make such corrective financial statements thereby substantially increasing the risk that the Company would fail to timely file certain financial reports with the SEC; and (8) as a result of the foregoing, the Company was unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2024. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

138.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

139.    As a result of Defendants Long, Battle, Braden, Cannito, Fulchino, Hart, Hayes, and Konert causing the 2024 Proxy Statement to be false and misleading, Company shareholders: (1) reelected Defendants Cannito, Hart, and Konert to the Board, thereby allowing them to continue to breach their fiduciary duties to BigBear; and (2) ratified the appointment of Grant Thornton LLP as the Company's independent registered public accounting firm for the year ending December 31, 2024.

### *May 10, 2024 Form 10-Q*

140.    On May 10, 2024, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the quarter ended March 31, 2024 (the "1Q

2024 10-Q"). "). The 1Q 2024 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 1Q 2024 10-Q and that "[t]he information contained in the [1Q 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

141.    Regarding the Company's adherence to GAAP, the 1Q 2024 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

142.    Regarding the effectiveness of the Company's disclosure controls and procedures the 1Q 2024 10-Q represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

143.    The 1Q 2024 10-Q, in its consolidated balance sheet, represented that the Company recorded a derivative liabilities figure of $24,956,000 and a "[t]otal stockholders' equity (deficit)" figure of $108,482,000 as of March 31, 2024. In its consolidated statement of operations, the 1Q 2024 10-Q represented that the Company recorded an interest expense figure of $3,555,000 and a net loss of $125,147,000 for the three months ended March 31, 2024. In its consolidated statement of cash flows, the 1Q 2024 10-Q reported an amortization of debt issuance costs figure of $506,000 for the three months ended March 31, 2024.

### *August 9, 2024 Form 10-Q*

144.    On August 9, 2024, the Company filed its Quarterly Report on Form 10-Q with the SEC for the quarter ended June 30, 2024 (the "2Q 2024 10-Q"). The 2Q 2024 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 2Q 2024 10-Q and that "[t]he information contained in the [2Q 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

145.   Regarding the Company's adherence to GAAP, the 2Q 2024 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

146.   Regarding the effectiveness of the Company's disclosure controls and procedures the 2Q 2024 10-Q represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

147.   The 2Q 2024 10-Q, in its consolidated balance sheet, represented that the Company recorded a derivative liabilities figure of $17,074,000 and a "[t]otal stockholders' equity (deficit)" figure of $102,756,000 as of June 30, 2024. In its consolidated statement of operations, the 2Q 2024 10-Q reported an interest expense figure of $3,551,000 for the second quarter of 2024 and $7,106,000 for the six months ended June 30, 2024, a "[n]et increase (decrease) in fair value of derivatives" figure of $7,882,000 for the second quarter of 2024, and a net loss of $11,737,000 for the second quarter of 2024 and $136,884,000 for the six months ended June 30, 2024. In its consolidated statement of cash flows, the 2Q 2024 10-Q represented that the Company recorded an amortization of debt issuance costs figure of $1,012,000 for the six months ended June 30, 2024.

### November 7, 2024 Form 10-Q

148.   On November 7, 2024, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the quarter ended September 30, 2024 (the "3Q 2024 10-Q"). The 3Q 2024 10-Q was signed by Defendants Long and Peffer and attached SOX certifications signed by Defendants Long and Peffer. The SOX certifications attested to the accuracy of the 3Q 2024 10-Q and that "[t]he information contained in the [3Q 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

149.    Regarding the Company's adherence to GAAP, the 3Q 2024 10-Q represented substantively the same statement as in the 2021 10-K. *Supra* ¶ 97.

150.    Regarding the effectiveness of the Company's disclosure controls and procedures the 3Q 2024 10-Q represented substantively the same statements as in the 2021 10-K. *Supra*, in ¶ 98.

151.    Further, the 3Q 2024 10-Q disclosed in its consolidated balance sheet that the Company recorded a derivative liabilities figure of $15,796,000 and a "[t]otal stockholders' equity (deficit)" figure of $98,433,000 as of September 30, 2024. The 3Q 2024 10-Q also disclosed in its consolidated statement of operations that the Company recorded an interest expense figure of $10,647,000 and a net loss of $149,060,000 for the nine months ended September 2024. Moreover, the 3Q 2024 10-Q disclosed in its consolidated statement of cash flows that the Company recorded an amortization of debt issuance costs figure of $1,517,000.

152.    The statements referenced and identified in ¶¶96-114, 122-132, 140-151 above were materially false and misleading and failed to disclose, *inter alia,* that: (1) the Company maintained inadequate accounting review policies concerning complicated or uncommon transactions; (2) as a result, BigBear incorrectly assessed that the stock conversion option within the 2026 Convertible Notes qualified for an exception under ASC 815-40; (3) the Company was in fact required to bifurcate the conversion option from the 2026 Convertible Notes for the purposes of accounting; (4) as a result of the foregoing, the Company incorrectly accounted for its 2026 Convertible Notes; (5) therefore, the Company incorrectly represented several items in its previous financial statements; (6) as a result of the foregoing, the Company would have to issue corrective financial statements; (7) the Company would require additional time and resources to make such corrective financial statements thereby substantially increasing the risk that the

48

Company would fail to timely file certain financial reports with the SEC; and (8) as a result of the foregoing, the Company was unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2024. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

153.    The truth began to emerge on March 18, 2025, when BigBear filed a current report on Form 8-K with the SEC which disclosed certain of the Company's financial statements since 2021 should no longer be relied upon, and would subsequently be restated (the "2021 Financial Restatement 8-K"). More specifically, the 2021 Financial Restatement 8-K stated:

> On March 17, 2025, the Company's Board of Directors (the "Board"), after discussion with the Audit Committee of the Board (the "Audit Committee") and with management of the Company and, following the Company's dialogue with the Company's independent registered public accounting firm, Grant Thornton LLP ("Grant Thornton"), concluded that the Company will need to restate its audited consolidated financial statements for the fiscal years ended December 31, 2022 and 2023 and the interim unaudited consolidated financial statements for each quarterly period in 2023 and in 2024 (collectively, the "Prior Financial Statements") and that the Prior Financial Statements, as well as the Company's audited consolidated financial statements for the fiscal year ended December 31, 2021, should no longer be relied upon for the reasons described below.
>
> In connection with the financial statements to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 Financial Statements") and, as part of the review of the accounting treatment of the Company's convertible secured notes issued in December 2024 (the "2029 Notes"), the Company, together with Grant Thornton LLP ("Grant Thornton"), the Company's independent auditors, reevaluated the accounting presentation of the Company's convertible notes due in 2026 (the "2026 Notes"), specifically, the accounting for the embedded conversion option. The Company and Grant Thornton had previously concluded that the embedded conversion option did not need to be accounted for as a derivative separate from the 2026 Notes, which was consistently reflected across all of the Company's historical financial statements. The Company requires additional time to complete valuations necessary to determine the impact on the Company's historical financial statements and to disclose the impact reflective of this change as of and for the fiscal year ended December 31, 2024. In

addition, the change in position on the interpretation and application of the accounting guidance will also result in the Company's restatement of the Prior Financial Statements.

154.    Moreover, that same day the Company filed an additional Current Report on Form 8-K with the SEC, which represented that the Company would be unable to timely file its the 2024 10-K "without unreasonable effort or expense" due to the additional time required to correct its previously issued financial statements.

155.    On this news, the price of the Company's stock fell $0.52 per share, or roughly 14.9%, from a closing price of $3.49 per share on March 17, 2025 to close at $2.97 per share on March 18, 2025.

156.    The Company would not file the 2024 10-K until the after-market hours of March 25, 2025. Regarding the errors in the Company's previously issued financial statements, the 2024 10-K stated, in relevant part, that:

> [F]or the period ended December 31, 2024, management identified a material error in the previously reported financial statements related to its convertible notes issued in December 2021 and due in December 2026 ("2026 Notes"). The conversion option embedded within the 2026 Notes was incorrectly deemed to be eligible for a scope exception from the bifurcation requirements of ASC 815-15 and therefore requires bifurcation as a derivative ("*2026 Notes Conversion Option*"). The 2026 Notes include certain adjustments to the conversion rate that violate the "fixed-for-fixed" criteria described in Accounting Standards Codification ("*ASC*") 815-40. As a result, the consolidated financial statements have been restated to reflect the issuance of the 2026 Notes Conversion Option at fair value as of December 7, 2021 and the subsequent remeasurement to fair value at each reporting date.

157.    Additionally, the 2024 10-K disclosed an overview of the adjustments in the Company's restatement of its previously issued consolidated financial statements. The adjustments to the items in the Company's consolidated balance sheets, statements of operations, and statements of cash flows included, among others:

50

| Period | Item | Previously Reported Figure | Restated Figure |
|---|---|---|---|
| As of December 31, 2021 | Total Stockholders' Equity (Deficit) | $122,368,000 | $159,688,000 |
| Year Ended December 31, 2022 | Amortization of Debt Issuance Costs and Discount | $2,303,000 | $11,958,000 |
| | Deferred Income Tax (Benefit) Expense | $1,757,000 | $1,924,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $1,591,000 | $21,387,000 |
| As of March 31, 2023 | Derivative Liabilities | $25,469,000 | $28,469,000 |
| Three Months Ended March 31, 2023 | Interest Expense | $3,556,000 | $6,084,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $10,567,000 | $13,012,000 |
| | Net Loss | $26,214,000 | $31,187,000 |
| | Amortization of Debt Issuance Costs and Discount | $500,000 | $3,028,000 |
| As of June 30, 2023 | Derivative Liabilities | $44,126,000 | $46,435,000 |
| Three Months Ended June 30, 2023 | Interest Expense | $3,560,000 | $6,186,000 |
| | Net Loss | $16,895,000 | $18,830,000 |
| Six Months Ended June 30, 2023 | Interest Expense | $7,116,000 | $12,270,000 |
| | Net Loss | $43,109,000 | $50,017,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,006,000 | $6,160,000 |
| | Net Increase (Decrease) in Fair Value of | $13,688,000 | $15,442,000 |

51

|  | Derivatives |  |  |
|---|---|---|---|
| As of September 30, 2023 | Derivative Liabilities | $28,467,000 | $29,166,000 |
| Three Months Ended September 30, 2023 | Interest Expense | $3,540,000 | $6,267,000 |
| Nine Months Ended September 30, 2023 | Interest Expense | $10,656,000 | $18,537,000 |
|  | Net Loss | $39,110,000 | $47,135,000 |
|  | Amortization of Debt Issuance Costs and Discount | $1,512,000 | $9,393,000 |
| Three Months Ended December 31, 2023 | Interest Expense | $3,544,000 | $6,340,000 |
|  | Net Loss | $21,256,000 | $23,522,000 |
| As of December 31, 2023 | Derivative Liabilities | $37,862,000 | $38,353,000 |
| Year Ended December 31, 2023 | Interest Expense | $14,200,000 | $24,877,000 |
|  | Net Loss | $60,366,000 | $70,657,000 |
|  | Amortization of Debt Issuance Costs and Discount | $2,018,000 | $12,695,000 |
|  | Deferred Income Tax (Benefit) Expense | $88,000 | $235,000 |
| As of March 31, 2024 | Derivative Liabilities | $24,956,000 | $25,262,000 |
|  | Total Stockholders' Equity (Deficit) | $108,482,000 | $143,173,000 |
| Three Months Ended March 31, 2024 | Interest Expense | $3,555,000 | $6,385,000 |
|  | Net Loss | $125,147,000 | $127,792,000 |
|  | Amortization of Debt Issuance Costs and Discount | $506,000 | $3,336,000 |
| As of June 30, 2024 | Derivative Liabilities | $17,074,000 | $17,181,000 |
|  | Total Stockholders' | $102,756,000 | $134,745,000 |

| | | | |
|---|---|---|---|
| | Equity (Deficit) | | |
| Three Months Ended June 30, 2024 | Interest Expense | $3,551,000 | $6,452,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $7,882,000 | $8,081,000 |
| | Net Loss | $11,737,000 | $14,439,000 |
| Six Months Ended June 30, 2024 | Interest Expense | $7,106,000 | $12,837,000 |
| | Net Loss | $136,884,000 | $142,231,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,012,000 | $6,743,000 |
| As of September 30, 2024 | Derivative Liabilities | $15,796,000 | $15,851,000 |
| | Total Stockholders' Equity (Deficit) | $98,433,000 | $127,463,000 |
| Nine Months Ended September 2024 | Interest Expense | $10,647,000 | $19,389,000 |
| | Net Loss | $149,060,000 | $157,366,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,517,000 | $10,259,000 |

158.    Regarding the Company's internal control over financial reporting, the 2024 10-K revealed, in relevant part:

*Material Weakness in Internal Control Over Financial Reporting*

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

In connection with the Company's evaluation of internal control over financial reporting for the year ended December 31, 2024, the following material weakness was identified:

> • *We have not consistently executed our technical accounting review policies, inclusive of the application of certain interpretations subject to*

*significant judgement or differences in interpretation, at a precision level sufficient to achieve complete, accurate and timely financial accounting, reporting and disclosures of certain non-routine, unusual, or complex transactions*.

The material weakness described above did not result in a material misstatement to the consolidated financial statements as of December 31, 2024 and the year then ended presented in this Annual Report on Form 10-K; however, the material weakness did result in a material misstatement to the consolidated financial statements as of and for the years ended December 31, 2023 and December 31, 2022, and as of and for the interim quarterly periods during the years ended December 31, 2024 and 2023 presented in this Annual Report on Form 10-K and labeled as restated.

159.    On this news, the price of the Company's stock fell $0.32 per share, or roughly 9.11%, from a closing price of $3.51 per share on March 25, 2025 to close at $3.19 per share on March 26, 2025.

## DAMAGES TO BIGBEAR

160.    As a direct and proximate result of the Individual Defendants' conduct, BigBear will lose and expend many millions of dollars.

161.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

162.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

163.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

164. Additionally, these expenditures include, but are not limited to, unjust compensation and benefits provided to the Individual Defendants who breached their fiduciary duties to the Company, as well as proceeds obtained through improper lucrative insider trading conducted by three of the Individual Defendants.

165. As a direct and proximate result of the Individual Defendants' conduct, BigBear has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

166. Plaintiff brings this action derivatively and for the benefit of BigBear to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of BigBear, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

167. BigBear is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

168. Plaintiff is, and has been at all relevant times, a shareholder of BigBear. Plaintiff will adequately and fairly represent the interests of BigBear in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## **DEMAND FUTILITY ALLEGATIONS**

169. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

170. A pre-suit demand on the Board of BigBear is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants McAleenan, Battle, Braden, Cannito, Fulchino, Hart, Hayes, and Konert (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Directors-Defendants that were on the Board at the time of the filing of this complaint.

171. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

172. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused BigBear to issue false and misleading statements which were intended to make BigBear appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

173. Additional reasons that demand on Defendant McAleenan is futile follow. Defendant McAleenan has served as CEO and as a Company director since January 15, 2025. He also previously served as the Company's President. As such, the Company provides Defendant McAleenan with his principal occupation for which he receives handsome compensation. Thus, as

the Company admits, he is a non-independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant McAleenan is named as a defendant in the Securities Class Action. For these reasons, Defendant McAleenan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Battle is futile follow. Defendant Battle has served as a Company director since December 2021. Defendant Battle also currently serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Battle has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Battle's insider sale, which yielded roughly $199,866 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Defendant Battle also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long, Braden, Dinu, and Katz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Battle solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Cannito, Hart, and Konert to the Board, thereby allowing them to continue breaching

their fiduciary duties to the Company. Moreover, Defendant Battle signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Battle breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Braden is futile follow. Defendant Braden has served as a Company director since December 2021. She also serves as a member of the Audit Committee. Defendant Braden has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Defendant Braden also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long, Dinu, Katz, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Braden solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, to reelect Defendants Cannito, Hart, and Konert to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Braden signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Braden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Cannito is futile follow. Defendant Cannito has served as Chairman of the Board and as a Company director since December 2021. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant

58

Cannito has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Cannito also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long, Braden, Dinu, and Katz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Cannito solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Hart, Konert, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Cannito signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Cannito breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Fulchino is futile follow. Defendant Fulchino has served as a Company director since December 2021. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Fulchino has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Fulchino also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long,

59

Braden, Dinu, and Katz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Fulchino solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Cannito, Hart, and Konert to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Fulchino signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Fulchino breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Hart is futile follow. Defendant Hart has served as a Company director since December 2021, and currently serves as a member of the Compensation Committee. Defendant Hart has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Hart also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long, Braden, Dinu, and Katz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Hart solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Cannito, Konert, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Hart signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Hart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested,

60

and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Hayes is futile follow. Defendant Hayes has served as a Company director since December 2021, and currently serves as the Chair of the Audit Committee. Defendant Hayes has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Additionally, Defendant Hayes' insider sale, which yielded roughly $52,640 in proceeds, demonstrates her motive in facilitating and participating in the fraud. Defendant Hayes also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long, Braden, Dinu, and Katz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Hayes solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Cannito, Hart, and Konert to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Hayes signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Hayes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Konert is futile follow. Defendant Konert has served as a Company director since December 2021, and currently serves as the Chair of the Compensation Committee. Defendant Konert has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted

little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Konert also solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Long, Braden, Dinu, and Katz to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Konert solicited the false and misleading 2024 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Cannito, Hart, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Konert signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons, Defendant Konert breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on the Board is futile follow.

182.    Defendants Braden, Cannito, Fulchino, Hart, and Konert have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. Namely, Defendants Braden, Cannito, and Fulchino serve as Operating Partners for AE Industrial Partners, LLC ("AE Industrial Partners"), which according to the 2025 Proxy Statement is a "leading private investment firm focused on aerospace, national security and industrial service." Moreover, Defendant Konert serves as a Managing Partner for AE Industrial Partners, and Defendant Hart serves as a Principal for AE Industrial Partners. These conflicts of interest render Defendants Braden, Cannito, Fulchino, Hart, and Konert beholden to each other as

they cannot disinterestedly consider a demand to sue partners in a lucrative business venture. Thus, demand upon Defendants Braden, Cannito, Fulchino, Hart, and Konert would be futile.

183. Defendants Hayes (as Chair), Braden, and Fulchino (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

184. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a

substantial likelihood of liability, and demand is futile as to them.

185.    BigBear has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for BigBear any part of the damages BigBear suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

186.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

187.    The acts complained of herein constitute violations of fiduciary duties owed by BigBear's officers and directors, and these acts are incapable of ratification.

188.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of BigBear. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the

64

Director-Defendants were to sue themselves or certain of the officers of BigBear, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

189.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause BigBear to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

190.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

65

193.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

194.    Under the direction and watch of the Individual Defendants, the 2023 and 2024 Proxy Statements were materially false and misleading in that they failed to disclose, *inter alia*, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 and 2024 Proxy Statements were materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

195.    Additionally, the 2023 and 2024 Proxy Statements further failed to disclose, *inter alia*, that (1) the Company maintained inadequate accounting review policies concerning complicated or uncommon transactions; (2) as a result, BigBear incorrectly assessed that the stock conversion option within the 2026 Convertible Notes qualified for an exception under ASC 815-40; (3) the Company was in fact required to bifurcate the conversion option from the 2026 Convertible Notes for the purposes of accounting; (4) as a result of the foregoing, the Company incorrectly accounted for its 2026 Convertible Notes; (5) therefore, the Company incorrectly represented several items in its previous financial statements; (6) as a result of the foregoing, the Company would have to issue corrective financial statements; (7) the Company would require additional time and resources to make such corrective financial statements thereby substantially

increasing the risk that the Company would fail to timely file certain financial reports with the SEC; and (8) as a result of the foregoing, the Company was unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2024. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

196. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 and 2024 Proxy Statements, including, but not limited to, the reelection of directors.

197. The false and misleading elements of the 2023 and 2024 Proxy Statements led to, among other things, the reelection of Defendants Long, Braden, Dinu, and Katz in 2023 and the reelection of Defendants Cannito, Hart, and Konert in 2024.

198. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

199. Plaintiff, on behalf of BigBear, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

200. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BigBear's business and affairs.

202. Each of the Individual Defendants violated and breached his or her fiduciary duties

67

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

203. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BigBear.

204. In breach of their fiduciary duties owed to BigBear, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company maintained inadequate accounting review policies concerning complicated or uncommon transactions; (2) as a result, BigBear incorrectly assessed that the stock conversion option within the 2026 Convertible Notes qualified for an exception under ASC 815-40; (3) the Company was in fact required to bifurcate the conversion option from the 2026 Convertible Notes for the purposes of accounting; (4) as a result of the foregoing, the Company incorrectly accounted for its 2026 Convertible Notes; (5) therefore, the Company incorrectly represented several items in its previous financial statements; (6) as a result of the foregoing, the Company would have to issue corrective financial statements; (7) the Company would require additional time and resources to make such corrective financial statements thereby substantially increasing the risk that the Company would fail to timely file certain financial reports with the SEC; and (8) as a result of the foregoing, the Company was unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2024. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

205. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders

68

them personally liable to the Company for breaching their fiduciary duties.

206. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

207. In yet further breach of their fiduciary duties, during the Relevant Period, three of the Individual Defendants engaged in lucrative insider sales while the Company's stock price was artificially inflated before the fraud was exposed, netting total proceeds of approximately $1.4 million.

208. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BigBear's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

209. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

210. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BigBear has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211. Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BigBear.

214.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from BigBear that was tied to the performance or artificially inflated valuation of BigBear or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

215.    Plaintiff, as a shareholder and a representative of BigBear, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

216.    Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

217.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence BigBear, for which they are legally responsible.

219.    As a direct and proximate result of the Individual Defendants' abuse of control,

70

BigBear has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, BigBear has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

220. Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

221. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

222. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of BigBear in a manner consistent with the operations of a publicly held corporation.

223. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, BigBear has sustained and will continue to sustain significant damages.

224. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

225. Plaintiff, on behalf of BigBear, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

226. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227. The Individual Defendants caused the Company to pay the Individual Defendants

71

excessive salaries and fees, to the detriment of the shareholders and the Company.

228. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused BigBear to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

229. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

230. Plaintiff, on behalf of BigBear, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendants McAleenan, Brothers, Long, Kinley, and Peffer for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

231. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232. BigBear and Defendants McAleenan, Brothers, Long, Kinley, and Peffer are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants McAleenan's, Brothers', Long's, Kinley's, and Peffer's willful and/or reckless violations of their obligations as officers and/or directors of BigBear.

233. Defendants McAleenan, Brothers, Long, Kinley, and Peffer, because of their positions of control and authority as officers and/or directors of BigBear, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of BigBear, including the wrongful acts complained of herein and in the Securities Class Action.

72

234. Accordingly, Defendants McAleenan, Brothers, Long, Kinley, and Peffer are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

235. As such, BigBear is entitled to receive all appropriate contribution or indemnification from Defendants McAleenan, Brothers, Long, Kinley, and Peffer.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of BigBear, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to BigBear;

(c) Determining and awarding to BigBear the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing BigBear and the Individual Defendants to take all necessary actions to reform and improve BigBear's corporate governance and internal procedures to comply with applicable laws and to protect BigBear and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board;

2. a provision to permit the shareholders of BigBear to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding BigBear restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a trial by jury.

74

Dated: July 8, 2025

Respectfully submitted,

**SPIRO & BROWNE, PLC**

*/s/ David G. Browne*
David G. Browne (VSB No. 65306)
Spiro & Browne PLC
2400 Old Brick Road
Glen Allen, VA 23060
Telephone: (804) 573-9220
Email: dbrowne@sblawva.com

*Attorneys for Plaintiff*


**OF COUNSEL:**


**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net